**READING NURSING CENTER,**
**Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW,**
**Respondent.**

**READING NURSING CENTER,**
**Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW,**
**Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 4, 1995.

Decided July 31, 1995.

---

Vincent Candiello, for petitioners.

Norina K.S. Stone, for respondent.

Before DOYLE and SMITH, JJ., and SILVESTRI, Senior Judge.

DOYLE, Judge.

Before the Court is the appeal of Reading Nursing Center (Employer) from an order of the Unemployment Compensation Board of Review which granted unemployment benefits to Mary T. Stutzman, Rose M. Osorio, and David Troche, representative claimants of 79 similarly situated employees of the Reading Nursing Center (collectively, Claimants).

The Board made the following findings of fact. Claimants, employees of the Reading Nursing Center, worked under a collective bargaining agreement with Employer, which expired on November 30, 1992. Prior to the expiration of the agreement Employer and the Service Employees International Union, District 1199P, were engaged in negotiating a new agreement, but had not been able to reach a settlement by November 30, 1992. Claimants continued to work under the terms and conditions of the old agreement after its expiration, but on February 11, 1993, the Union initiated a work stoppage at the nursing home and established and maintained

picket lines.[1] Approximately 134 union members were on strike.[2]

On February 12 and 13, 1993, employment advertisements were published in the local newspapers, soliciting applications for "permanent replacements" for striking employees. On February 12, 1993, newspaper articles contained quoted statements made at a press conference by Michael P. Mervis, a spokesperson for Employer's parent company, Unicare. Mr. Mervis stated that "[w]e're going to hire permanent, not temporary, replacement workers regarding the current labor-disputes at Broad Mountain and Reading Nursing Center." (Finding of Fact No. 12.) On February 15, 1993, the president of the Union wrote to the president of Unicare requesting clarification of Mr. Mervis' statements at the press conference. Employer responded to this letter through counsel, by a letter dated February 17, 1993, which stated that "Michael Mervis correctly stated the position of the Company in his statement of February 12, 1993. It is the Company's intention to hire permanent replacements for bargaining unit employees on strike at both [3] facilities if such action is necessary." (Finding of Fact No. 13.)

Some of the vacancies at the facility were filled with temporary workers from sister facilities. After the first few days of the strike, however, Employer contacted and hired employees who were referred to Employer by employment agencies, in addition to new workers responding to the classified advertisement. By February 14, 1993, over 100 replacements were hired. At least one replacement, Ms. Baker, was informed that her position was permanent. (*See* Findings of Fact Nos. 25–33.)

The Board found that Employer did not advise Claimants at any time during the work stoppage that their jobs were still available if they wanted them. The Union re-peatedly attempted to raise the issue of permanent replacements, but Employer refused to discuss the issue until a new contract was agreed upon. Employer only referred the Union to the February 17, 1993 letter as a statement of its position.

In March of 1993 the Union held a rally at employer's corporate headquarters in Langhorne, Pennsylvania. At the rally, the director of labor relations, Dick Rambo, and the assistant vice president of operations, Joyce Karoleski, "had words" with the union members. At some point, Ms. Karoleski yelled at the union members, "[y]ou'll never step back into that damned building again. You're fired. You're all fired. You don't have a job anymore." (Finding of Fact No. 23.) The Board concluded that Claimants reasonably believed that they had been discharged.

By May 28, 1993, the parties reached a tentative settlement. Claimants and other union members who had been permanently replaced obtained their positions back through return to work negotiations. Except for probationary, temporary and casual employees, all those who had participated in the work stoppage were recalled to work. Approximately 30 to 35 employees hired during the strike were retained by Employer, including Ms. Baker.

Claimants applied for unemployment benefits, which were granted by the Job Center. The referee affirmed the determination of the Job Center, and held that Claimants were ineligible only for benefits for the week ending February 13, 1993, because of the work stoppage. The referee further held that Claimants were entitled to benefits for the weeks ending February 20, 1993, through June 5, 1993, because they had been permanently replaced. The Board affirmed and this appeal followed.

---

1. The Union complied with all applicable federal laws concerning notice of the impending work stoppage to Employer.

2. The striking union members consisted of nursing assistants, licensed practical nurses, med treatment nurses, dietary aids, cooks, housekeepers, maintenance workers and laundry workers.

3. Two facilities owned by Unicare were on strike at the same time under similar circumstances. See this Court's companion decision in *Northern Health Facilities, d/b/a Broad Mountain Nursing Center v. Unemployment Compensation Board of Review,* —— Pa.Commonwealth Ct. ——, 663 A.2d 276 (1995).

Employer argues that: (1) Claimants failed to sustain their burden of proving that they had been permanently replaced, and (2) Employer sustained its burden of proving that continuing work was available to Claimants and, therefore, benefits should have been denied. Employer also contends that the referee deprived it of its due process rights by failing to grant a continuance.

Section 402(d) of the Law provides: [4]

An employe shall be ineligible for compensation for any week—

. . . .

(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed. . . .

The issues raised in this case invoke the principle interpreting Section 402(d) of the Law enunciated by this Court, and recently affirmed by the Supreme Court, in *Canonsburg General Hospital v. Unemployment Compensation Board of Review*, 156 Pa.Commonwealth Ct. 533, 628 A.2d 503 (1993), *affirmed*, 540 Pa. 531, 658 A.2d 790 (1995) (per curiam). In that case we held that in a labor dispute,

> where the employer hires *permanent* replacement employees, absent any evidence in the record and pertinent findings thereon that continuing work remains available to the striking workers, the case must be considered as one where the employment relationship has been severed. . . . We further make it clear that the burden is upon the employer to show that it advised the striking employees that despite the hiring of permanent replacements work was still available to them. . . .

*Id.* at 547–48, 628 A.2d at 510 (emphasis in original). The rationale for this holding is obvious: when an employer hires permanent replacements for striking employees, the employer is not only changing the status quo, it is severing the employment relationship. Thus, a claimant's loss of employment is no longer caused by his or her decision to participate in a strike, but is the result of an employer's constructive discharge of the claimant from employment. We are invited by the facts of this case to refine our holding in *Canonsburg Hospital.*

Employer first contends that it is Claimants' burden to prove that the replacement workers who were hired were permanent replacement workers. Employer does not contest that it hired replacement workers; only that it never directly informed Claimants that they were permanently replaced.

■ *Canonsburg Hospital* does not require that Claimants be directly informed that they have been permanently replaced; rather, Claimants' burden is to show that they had a reasonable belief that they were permanently replaced. The burden then shifts to Employer to show that the replacement employees were not permanent and that work remained available to Claimants. Accordingly, we find that there was adequate evidence in the record for the Board to conclude that Claimants reasonably believed that they were permanently, not temporarily, replaced.

The referee admitted into evidence a news article reporting a press conference given by Employer's public relations spokesperson, Michael P. Mervis. Claimant also submitted a "Help Wanted" and from the local paper which stated that Employer was looking for "permanent replacements." Employer contends that this evidence is hearsay and should not have been admitted or considered by the Board.

First, the Board made only limited findings of fact concerning these items, and did not rely on them for the truth of the statements which were made.[5] Since the items

---

4. Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex.Sess., P.L. (1937), 2897, *as amended*, 43 P.S. § 802(d).

5. Specifically the Board only found that:
> 9. On February 12, 1993, and February 13, 1993, help-wanted ads were published in a

local newspaper advertising that positions were available with employer.
> 10. The ads contained the phrase "permanent replacement."
> 11. On February 12, 1993, a newspaper article regarding the strike was published, and the article contained a statement made at a

were not used for the truth of the what the items contained, they are not hearsay. *Commonwealth v. Jacobs*, 445 Pa. 364, 367, 284 A.2d 717, 719 (1971), *cert. denied*, 409 U.S. 856, 93 S.Ct. 135, 34 L.Ed.2d 100 (1972) ("The hearsay rule has no application where the question is whether certain things were said or written by a third person and not whether they are true.").

The Board did make significant findings to support its conclusion that Claimants were permanently replaced for the purposes of the Law:

12. On February 15, 1993, the President of District 1199P wrote to the President of the Corporation which owns employer and stated in his letter:

Newspaper accounts in the area around Frackville, dated February 12, 1993, quoted an employee of Unicare named Michael P. Mervis who stated, "We're going to hire permanent, not temporary, replacement workers regarding the current labor-dispute at Broad Mountain [6] and Reading Nursing Center."

Given the serious nature of this threat by Mr. Mervis, I am compelled to write to you as the President of the Corporation to have you please clarify the intent and meaning of Mr. Mervis' public statements.

13. In a letter dated February 17, 1993, counsel for employer [William J. Flannery, Esq.] responded to the District President's letter stating:

Michael Mervis correctly stated the position of the Company in his statement of February 12, 1993. It is the company's intention to hire permanent replacements for bargaining unit employees on strike at both facilities if such action is necessary. In judging necessity, the factors which will be considered are, in significant part, the length of the work stoppage and whether it is necessary to offer permanent employment in order to secure the services of a qualified individual.

The decision when and whether to permanently replace employees will be made on a case-by-case basis. We will identify who, if anyone, has been permanently replaced as part of the negotiations of the back-to-work agreement or after the Union makes an unconditional offer to return to work under the terms and conditions of the old contract.[7]

Additionally, there was evidence on the record that the Union repeatedly attempted to elicit from Employer information concerning replacements who were being hired. Employer consistently refused to discuss replacements, making such negotiations contingent upon the Union's agreement to return to work. Employer instead referred the Union to the Flannery letter of February 17, as a statement of its position concerning replacements, and would not identify which, if any, employees were permanently replaced or discuss the matter further. Several employees testified that they believed that they had been permanently replaced, based on the public statements which appeared in the newspaper, and Employer's refusal to discuss the issue during negotiations. The impression was bolstered by the events at a March 1993 rally where Employer's assistant vice president of operations told the strikers that they were all fired.[8]

We find that Employer used every means available to avoid directly informing the Union that permanent replacements were being hired, but went to similar great lengths to give such an impression indirectly. We note the language of the Supreme Court in *Hoffman v. Unemployment Compensation Board of Review*, 524 Pa. 470, 484, 574 A.2d 57, 63–64 (1990):

When a work force is on strike and a plant operation is shut down, it is not in the

---

press conference by Michael P. Mervis, a spokesperson for employer's parent company, Unicare.

6. See *supra* note 3.

7. Both of these letters were admitted into evidence without objection.

8. Employer argues in its brief to this Court that the testimony concerning this event was hearsay. However, as Employer admits in its brief to the Board, this testimony was not objected to at the hearing.

interest of the worker, the company or society to have each side posturing for position. We do not favor gamesmanship in labor negotiations. It is essential that all parties approach negotiations with proper motives and deal with each other in good faith.

It is obvious, viewing all the evidence as a whole, that the Board was correct to conclude that Employer had severed its relationship with Claimants and hired permanent replacements for the purposes of unemployment benefits. Moreover, Employer failed to inform the Union, either directly or indirectly, that work was available, as it is required to do under *Canonsburg Hospital.*

 Employer argues that it is unfair to require it to prove a negative, that is, that the replacements were not permanent. We disagree, and find to the contrary: it would be fundamentally unfair to require Claimants to prove that replacements hired by Employer were permanent and not temporary, when Employer is in the superior position to provide this information. Placing such a burden on Employer is consistent with the Supreme Court's holding in *Miceli v. Unemployment Compensation Board of Review,* 519 Pa. 515, 549 A.2d 113 (1988):

> Placing the burden on the employer when it is an act of the employer that causes a change in the existing employment relationship or situation is not unusual and is consistent with the burden of proof allocations in proceedings involving other unemployment compensation issues. For example, when a claimant has been fired for willful misconduct, it is the employer who has the burden of proving such misconduct. On the other hand, where the claimant has voluntarily quit his employment, the claimant has the burden of proving that he quit for necessitous and compelling reasons.

*Id.* at 523, 549 A.2d at 117 (citations omitted). In a situation where the employer hires replacements, the employer is causing a change in the then status quo.

Employer next argues that there was ample evidence in the record to prove that work remained available to Claimants, and therefore, they are not entitled to unemployment benefits. Our review of the record does not reveal such evidence. Although, as Employer contends, some statements were made that no decision had been made relative to permanent replacements, such assurances were belied by Employer's actions. It is also not a compelling fact that some strikers who crossed the picket lines were reinstated and that union members were permitted to return to work *after* the strike was over. The fact remains that Employer made every effort to generate the belief among the striking employees that permanent replacements had been hired and refused to assure the Union that work would continue to be available to the remaining striking employees.

Finally, Employer argues that it was denied its constitutional rights to due process when the referee refused to grant a continuance to allow Employer to call Joyce Karoleski, Employer's assistant vice president of operations, to the stand. The Board counters that this issue was not raised before the Board and the issue is, therefore, waived. We have examined the record and note that although a vague reference was made to constitutional rights in its appeal to the Board, Employer does not develop this argument or mention it in its brief to the Board. Since this issue was not adequately raised or developed before the Board, it will not be considered by this Court. *Tri–State Scientific v. Unemployment Compensation Board of Review,* 138 Pa.Commonwealth Ct. 676, 589 A.2d 305 (1991) (issues not specified in an appeal before the Board are waived for the purposes of review by this Court).

The order of the Board is affirmed.

### ORDER

NOW, July 31, 1995, the order of the Unemployment Compensation Board of Review in the above-captioned matters is hereby affirmed.

SILVESTRI, Senior Judge, dissents.