NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-2157
_____

JAMES J. BINNS, as sole shareholder of James J. Binns, P.C.,
Appellant

v.

*TRUIST BANK,
AKA Branch Banking & Trust Co

v.

John Does 1-22

(*Amended Per Court Order dated January 24, 2020)
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-18-cv-01166)
District Judge: Honorable Gerald A. McHugh
_____

Submitted Under Third Circuit LAR 34.1(a)
January 23, 2020

Before: AMBRO, MATEY, and ROTH, *Circuit Judges*.

(Filed: March 9, 2020)

_____

OPINION[†]
_____

MATEY, *Circuit Judge*.

James Binns alleges Truist Bank allowed unauthorized electronic withdrawals from his account, and wants the money returned. But his claims are barred under his agreement with the bank, so we will affirm the District Court's decisions.

## I. BACKGROUND

This dispute stretches back to 2013, involves banks, two accounts, and an argument between a father and a daughter over money. First, the banks: Binns was a customer of National Penn Bank until 2016, when BB&T Bank acquired National, and Binns's business. BB&T has since changed its name to Truist Bank ("Truist").

Next, the accounts: Binns maintained the James J. Binns, P.C. account for business purposes (the "Commercial Account"), and a separate account for his personal banking (the "Personal Account"). Sometimes, he may have used the Commercial Account for personal matters. Both National and BB&T sent Binns monthly statements detailing his transactions. Binns, unfortunately, never reconciled the charges.

And finally, the family: Binns alleges that from 2013, through 2017, his daughter used the routing and account number for the Commercial Account to request hundreds of

---

[†] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7., does not constitute binding precedent.

electronic Automated Clearing House ("ACH") transactions to pay her bills. As Binns maintains those transactions were not authorized, he asks Truist for reimbursement.

## A. The Withdrawals

When the unauthorized withdrawals from the Commercial Account began, National held the money. Binns first noticed an unauthorized transaction in his January 2013 statement. So Binns reached out to National saying he didn't recognize the payment. National explained it could simply be a check converted into an electronic withdrawal. Binns suspected otherwise, but dropped the matter. Four years later, with the account now held by BB&T, he placed a call to the bank asking about another unfamiliar payment. BB&T asked for additional information, and Binns said he would call back. He never did.

But later that year, a BB&T employee advised Binns that his daughter had visited the bank to make several withdrawals from Binns's Personal Account. Now, Binns set about reconciling his Commercial Account statements and discovered questionable withdrawals. At BB&T's request, Binns submitted various affidavits, beginning on February 10, 2017, which listed several unauthorized transactions dating to 2016. BB&T refunded all but one. And, critically, Binns acknowledges his affidavits were the first written notice of unauthorized transactions he submitted to either National or BB&T.

## B. The Lawsuit

Binns proceeded to court, filing a complaint against BB&T, seeking recovery from unauthorized transactions based on Uniform Commercial Code (UCC) Article 3. 13 Pa. Cons. Stat. § 3406(b). Discovery began, leading Binns to claim 267 unauthorized transactions. Truist responded with a motion for summary judgment, arguing the terms of

3

the bank's customer agreements precluded relief. The District Court agreed with Truist, granting the bank's motion for summary judgment. Ten days later, the District Court denied Binns's motion for reconsideration. This timely appeal followed.[1]

## II. BINNS'S CLAIMS ARE BARRED BY THE BANKING AGREEMENTS

The Pennsylvania version of the UCC allows even a negligent banking customer to recover a loss if the bank "fails to exercise ordinary care in paying or taking [an] instrument and that failure substantially contributes to loss." 13 Pa. Cons. Stat. § 3406(b). Thus, if applicable, the UCC might offer Binns a theory to recover additional improper withdrawals. Truist argues that the UCC does not apply to this action, and that the terms promulgated by BB&T, and accepted by Binns (the "Customer Agreements"), control. The District Court agreed with Truist that the Customer Agreements control, and that they bar Binns's claims. As we agree with the District Court, we will affirm that decision.

### A. The UCC

We begin by considering whether the UCC applies. Binns brought his claims under Article 3 of the UCC, 13 Pa. Cons. Stat. § 3406(b), and Truist raised defenses under Article

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1332(a). We have jurisdiction under 28 U.S.C. § 1291 to review the District Court's final order granting Truist summary judgment and denying Binns's motion for reconsideration. Our review of the summary judgment order is de novo, examining whether "there is no genuine issue as to any material fact" making the movant "entitled to judgment as a matter of law." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). We review the denied motion for reconsideration for an abuse of discretion. *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 673 (3d Cir. 1999).

4

4 of the UCC. *Id.* §§ 4111, 4406. But neither Article controls the electronic transactions in dispute.

Start with Article 3, governing negotiable instruments. *Id.* § 3102(a). A "'negotiable instrument' is limited to a *signed writing* that orders or promises payment of money." *Id.* § 3104, cmt. 1 (emphasis added). Here, of course, the electronic transactions occur with the use of routing and account numbers, rather than a signed writing. So, as ordinarily understood, the ACH withdrawals are not signed writings, making Article 3 inapplicable.

Similarly, "Pennsylvania's adoption of Article 4 does not contemplate electronic withdrawals" and "was meant to apply only to traditional written instruments, rather than electronic means of transferring and withdrawing funds." *Hopsicomm, Inc. v. Fleet Bank N.A.*, 338 F. Supp. 2d 578, 586 (E.D. Pa. 2004). As a result, we agree that Article 4 does not govern the ACH transactions.[2] That takes this dispute out of the UCC and into the terms of the Customer Agreements. And under those terms, Binns's claims are barred.

## B. The Customer Agreements

The District Court concisely stated the issue: "No single provision in the Banking Agreements precludes all 267 transactions, but when considered together, the Agreements bar all of Mr. Binns's claims." (App. at 15.)

First, the Customer Agreements disclaim liability for transactions by the same unauthorized party if the customer does not provide timely written notice (sixty days for

---

[2] Though Article 4A covers credit wire transfers, 13 Pa. Cons. Stat. § 4A104, cmt. 4, that does not aid Binns. As the District Court rightly noted, the parties waived any argument that Article 4A applies.

National, thirty days for BB&T). Thus, under the National Customer Agreement, Binns had until April 1, 2013, to file his claim based on the unauthorized withdrawals in the January 31, 2013 statement. Yet, by his own admission, he did not report any unauthorized transactions until 2017. Second, the BB&T Customer Agreement limits the bank's liability to one year.[3] Third, the BB&T Customer Agreement obligates customers to provide prompt notice of any problems based on a reconciliation of the posted transactions, steps Binns concedes he did not take.

And finally, the BB&T Customer Agreement limits the bank's maximum liability for an unauthorized transaction to the amount of the transaction. Because BB&T already refunded a portion of Binns's claims, double recovery on those transactions is prohibited. Taken together, the Customer Agreements bar Binns's claims.

## C. Immaterial Factual Disputes

But Binns argues that facts surrounding the parties' performance of the Customer Agreements make summary judgment improper. None are genuinely in dispute.

First, there is no disagreement about when Binns provided notice. In his deposition, he explained that he first "expressed to [bank employees] that [he] thought these transactions were unauthorized" in February 2017. (App. at 62.) True, he twice called about unfamiliar transactions on his monthly statements. But he stopped short of notifying the

---

[3] We reach the same conclusion under the Pennsylvania UCC. Assuming, without deciding, that the UCC applies, the Code provides defenses against all Binns's claims. As with the Customer Agreements, the "same wrongdoer" limitation bars all but the first few transactions. *See* 13 Pa. Cons. Stat. § 4406(d)(2). And a one-year statute of limitations bars the rest. *See id.* § 4406(f).

bank that these transactions were not his. That leaves the February 10, 2017 affidavit as the initial notice, which was sent too late.[4] Nor does equitable tolling assist, as the doctrine applies to deadlines imposed by law, not in private agreements. *See, e.g.*, *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 240 (3d Cir. 1999) ("Under equitable tolling, plaintiffs may sue after the *statutory time period . . .* has expired[.]") (emphasis added); *Equitable Tolling*, *Black's Law Dictionary* (11th ed. 2019) ("The doctrine that the *statute of limitations* will not bar a claim" in certain circumstances.) (emphasis added).[5]

Binns also argues that because BB&T permitted his daughter to make withdrawals from his Personal Account, it is responsible for the alleged fraudulent withdrawals from his Commercial Account. But no authority supports his position that his daughter's transactions imposed a duty on BB&T to investigate. Indeed, the Customer Agreements place that burden on Binns. Nor does he explain why this purported "bad faith" prevented him from giving timely notice of the hundreds of transactions he ultimately flagged as fraud.

Finally, Binns criticizes BB&T for waiving the required notice when it provided a refund. Yet, the Customer Agreements state that the bank could pardon deficient

---

[4] Binns suggests that the District Court should have considered whether his calls about two of the transactions provided "reasonable notice." But that "reasonable" standard comes from the UCC, *see* 13 Pa. Cons. Stat. § 1202(d), not the Customer Agreements. And as we have explained, the Customer Agreements, not the UCC, control.

[5] Equitable tolling could apply to the UCC but, even if the UCC governed, it would make no difference to the outcome. The UCC provides that the parties are free to modify the standard terms of the statute by private agreement. Binns and the banks exercised that latitude to craft a specific and limited notice provision. And under the UCC, that agreement controls. 13 Pa. Cons. Stat. § 4103(a).

7

performance without sacrificing the right to insist on the terms of the contract in other transactions. In all, the factual quarrels Binns raises are immaterial, and summary judgment for Truist was proper.

### III. THE MOTION FOR RECONSIDERATION WAS PROPERLY DENIED

For largely the same reasons, we also discern no abuse of discretion in the District Court's decision to deny Binns's motion for reconsideration. *See Max's Seafood Cafe*, 176 F.3d at 673. A motion for reconsideration is granted only if it "rel[ies] on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice." *N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (internal quotation marks and brackets omitted). None of the issues Binns raises meet those standards.

First, Binns contends that the disputed transactions are checks instead of electronic transfers. No intervening law bolsters that point, and the evidence he cites—his own deposition and a letter from Truist—is not new. And, of course, even if some transactions were checks, all that would mean is that Article 3 of the UCC applies. That is no help to Binns because, as noted, the terms of the Customer Agreements prevail.

Next, Binns points to the same Truist letter suggesting Truist believed the UCC should govern this dispute. That is not an intervening legal development, nor a newly

8

developed matter of fact. And, again, it is the superseding terms of the Customer Agreements that control.[6]

Finally, Binns reiterates the same issues raised in his appeal from summary judgment. For the same reasons he does not prevail on those arguments, he cannot succeed under the more burdensome abuse of discretion standard. *Max's Seafood Cafe*, 176 F.3d at 673. Therefore, the District Court did not abuse its discretion when denying Binns's motion for reconsideration.

## IV.  CONCLUSION

For these reasons, we will affirm the decision of the District Court.

---

[6] His argument about the application of UCC Article 4A fails for the same reasons.